Filed 10/8/14  P. v. McCartney CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

N THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>DAMIEN McCARTNEY,<br><br>        Defendant and Appellant. | A132358<br><br>(San Francisco City & County<br>Super. Ct. No. 212299) |
| In re DAMIEN McCARTNEY,<br><br>        on Habeas Corpus. | A140809 |

**I.**

**INTRODUCTION**

Appellant Damien McCartney was convicted by a jury of two counts of kidnapping for the purpose of committing rape, oral copulation, and/or sexual penetration (Pen. Code, § 209, subd. (b)(1))[1]; two counts of rape by force, violence, or threat of bodily injury (§ 261, subd. (a)(2)); penetration by a foreign object (§ 289, subd. (a)(1)); and forcible oral copulation (§ 288a, subd. (c)(2)).  Various weapon and sentencing enhancements were also found true, including that he used a deadly weapon in the commission of the offenses (§ 12022.3, subd. (a)), and that he kidnapped the victim and substantially increased the risk of harm inherent in the underlying rape offenses (§ 667.61, subdivision (d)(2)).  McCartney was given a total state prison term of 118 years to life.

---

[1] All statutory references are to the Penal Code.

1

On appeal, McCartney contends: (1) the court erred in denying his motion to discharge appointed counsel so that he could represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*); (2) the court abused its discretion in denying his request to continue the trial so that his counsel could conduct additional pretrial investigation; (3) he was denied effective assistance of counsel by his counsel's multiple deficiencies, including failing to conduct an adequate pretrial investigation, interview potential defense witnesses, file meritorious motions, and present certain critical evidence; and (4) the court abused its discretion in denying his motions for substitute counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118, 123 (*Marsden*).

McCartney has also filed a petition for writ of habeas corpus. Most of the claims made in McCartney's petition for writ of habeas corpus relate to and overlap with his contentions on appeal. Therefore, on our own motion, we order the petition consolidated with the appeal for purposes of resolution by a single opinion. We reject McCartney's contentions on appeal and affirm the judgment. We also deny the petition because McCartney has failed to make a prima facie case that he is entitled to relief.

## II.

## STATEMENT OF FACTS

At approximately 4:30 a.m. on October 4, 2001, Claudia[2] left her home on Oliver Street in the Mission District in San Francisco and walked to the nearest Muni stop to wait for a bus to take her to work at a laundry. While she was waiting at the bus stop, a man approached her and grabbed at her hand. She pulled away and tried to run back home.

The man grabbed her by her wrists. She screamed for help. He pulled her across Mission Street as she continued screaming for help. At some point, she dropped her lunch and purse. He produced a knife and held it to her throat as he continued to drag her, putting his other arm around her neck in a chokehold. The knife caused Claudia to

---

[2] In referring to the sexual assault victim in this case, we will use only her first name. We do this solely in the interest of protecting her privacy. No disrespect is intended.

2

fear for her life and to diminish her physical and verbal resistance, believing she would be killed if she continued to resist.

He took her inside the front yard of a house on Farragut Street and threw her on the ground. He then put on a condom and sexually assaulted her, including digital penetration and forcible rape. He then stood up. She remained on the ground and was aware police were driving around the area. The man then moved her to the other side of the car which was parked in the driveway, out of view, and sexually assaulted her again, including touching her vagina with his tongue. This time he did not use a condom and he ejaculated into her vagina.

After he was finished, the man forced Claudia to walk with him toward Alemany Street and the I-280 freeway. She used the ruse of having to tie her shoelaces to escape his grasp and was able to run away. She was located shortly thereafter by police officers responding to a phone tip from a witness who had seen Claudia being kidnapped. The witness had directed the police to her purse, which she had dropped, containing her identification. Claudia told the police that she had been sexually assaulted by a Black man, who was between 20 and 26 years old, six feet tall, and weighing about 200 pounds.

Claudia was taken to the hospital for a sexual assault examination. The exam revealed grass, dirt, and semen inside of Claudia's vagina, as well as significant tearing of her labia, a two-centimeter abrasion on her labia, tenderness in the pubic area, and significant bruising on her neck. Various swabs were taken from Claudia's vagina and were placed into the rape kit for DNA analysis. Shortly thereafter, Claudia worked with a sketch artist to create a drawing of the person who had attacked her.

The identity of the rapist remained a mystery until a DNA "cold hit" in 2006 identified McCartney. Investigators attempted to locate Claudia, but they were unable to find her until 2009. At that point, an arrest warrant was issued for McCartney, who was in custody in Santa Clara County for another offense.

Criminalist Tahnee Nelson, who was employed by the San Francisco Police Department Crime Laboratory (SFPD Crime Lab), compared a reference sample taken from McCartney to the DNA of the perpetrator recovered during the sexual assault exam.

3

Nelson testified that the probability that the sperm sample found inside Claudia did not come from McCartney was "approximately 1 in 22 billion for U.S. Caucasians; 1 in 34 billion for African Americans; 1 in 179 billion for California Hispanics; and 1 in 66 billion for general Asians."

Claudia identified McCartney at trial as the man who had kidnapped and raped her on October 4, 2001. Despite the passage of time, Claudia was certain of her identification, stating, "If somebody harms you in this way sometimes, you'll never forget what they look like," adding that "his face has never been erased from my mind."

The sketch that the artist prepared from Claudia's description shortly after the attack bore several similarities to a mug shot taken of McCartney around the same time for a parole violation. Both faces exhibit a distinctive hairstyle, eyes, lips, chins, cheekbones, and foreheads.

The prosecution also introduced evidence of a prior sexual assault committed by McCartney. (Evid. Code, § 1108.) The jury heard testimony from Crystal[3], who testified that McCartney had raped her in 1998, when she was 16 years old. On February 7, 1998, around 11:30 p.m., Crystal was waiting for her boyfriend at the Balboa Park BART station in San Francisco. McCartney approached her, they chatted and smoked marijuana. Eventually, McCartney persuaded Crystal to come to a motel, located in the same general vicinity where Claudia was assaulted three years later, so that she could use the phone to call her boyfriend. Once in the motel room, Crystal attempted to use the telephone, but it didn't work. She went downstairs and talked to the manager, but was informed that the phone was inoperable. She went back upstairs to get her jacket, but McCartney refused to let her leave.

McCartney ordered Crystal to take her clothes off. She eventually complied. He placed her on the bed. Over the course of that night and the next morning, McCartney raped her several times, ejaculating inside of her each time. The next morning, they left the motel together. When McCartney went into a McDonalds, Crystal ran to the BART

---

[3] Once again, we have used the first name only to protect the victim's privacy.

station, got on a train, and went home.  She reported the incident to police later that night. McCartney was charged and prosecuted for the assault on Crystal and eventually entered a plea to unlawful sex with a minor.  (§ 261.5, subds. (a), (c).)

After the prosecution presented its case, the defense chose to rest on the state of the evidence.  Defense counsel argued that the prosecution had not met its burden of proving guilt beyond a reasonable doubt.  Specifically, the defense attempted to cast doubt on the reliability of the DNA evidence and the accuracy of Claudia's eyewitness identification.  With regard to Crystal's testimony describing a prior sexual assault in a hotel room, defense counsel attempted to cast doubt on Crystal's description of the pertinent events, emphasizing "the crime for which he was ultimately convicted was a statutory rape, meaning that it was not one that is inherently violent . . . ."

The jury convicted McCartney on all counts, and all enhancing allegations were found to be true.  McCartney was sentenced on June 29, 2011.  In sentencing McCartney, the court found he "has engaged in violent conduct that indicates a serious danger to society.  The prior convictions that he has sustained are numerous and are of increasing seriousness. . . .  [He] was on probation or parole when the crime was committed." McCartney received a total sentence of 118 years to life in state prison.  This appeal and writ for petition of habeas corpus followed.

## III.

## DISCUSSION

### 1.  Denial of Right of Self-Representation

In a claim made on direct appeal and repeated in his habeas corpus petition, McCartney contends that he was improperly denied his constitutional right to represent himself under *Faretta*, *supra*, 422 U.S. 806, and that his counsel was ineffective in failing to assert McCartney's *Faretta* rights in a timely fashion.

By way of background, on September 3, 2010—over eight months after defense counsel had been appointed to represent McCartney—McCartney first indicated that he wanted to bring a motion to represent himself at trial under *Faretta*.  However, on

5

January 25, 2011, McCartney withdrew his *Faretta* motion after he had an opportunity to discuss the case with defense counsel.

As McCartney notes in his habeas petition, he had elbow surgery on March 15, 2011, and was unable to attend court on March 18, 2011. On March 25, 2011, the matter was on calendar for both jury trial and defense counsel's motion to continue. At the outset of that hearing, counsel waived McCartney's appearance and requested and received a continuance of the pending trial because he had not yet completed all of his trial preparation.[4] The motion was granted and trial was continued to April 22, 2011.

On April 22, the day set for trial, McCartney once again moved to represent himself. The trial court expressed skepticism regarding the timeliness of the motion because McCartney had waited "until the last minute, since it is set to go out to trial this morning." The trial court stated that "today the case is on the trial calendar and you have come forward just today," and asked "[a]re you ready to go to trial today?" McCartney responded, "No. No. No. . . . I have a serious operation coming up, so while I'm rehabilitating I will be able to have a chance to do my work myself." The trial court asked, "What do you mean? You are not ready to go to trial today? When are you going to be ready to go to trial?" McCartney stated that he had "a number of requests" for the court, and admitted that he was not ready to represent himself at trial—in fact, he told the court that an upcoming surgery might leave him unable to walk or talk for an extended period of time.

The trial court noted that defense counsel had not filed a motion to continue that morning and thus was ready to go to trial, a point with which defense counsel agreed. The trial court told McCartney, "You are asking the Court to delay the trial until after that

---

[4] McCartney insinuates that defense counsel could not waive his appearance at this hearing held to continue the trial. However, the California Supreme Court has held: " '[T]he accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and the burden is upon him to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial. [Citation.]' [Citation.]" (*People v. Ervin* (2000) 22 Cal.4th 48, 74.)

6

and after you have undergone rehabilitation and recovery. And then potentially after that, based upon what happens during the surgery, you are unable to speak, so if you represent yourself you can't be sent out for trial. Is that kind of what you are saying?" McCartney said that he would need time to prepare, and admitted that the surgery had not even been scheduled yet.

Highlighting the numerous *Marsden* and *Faretta* motions that McCartney had filed, the trial court ruled that the request on the day of trial was untimely under *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*). *Windham* holds that the reasonable time requirement is intended to prevent a defendant from unjustly delaying the trial or obstructing the orderly administration of justice. (*Id.* at p. 128, fn. 5.) The trial court noted that the case had already been continued to allow defense counsel to prepare an adequate defense, and that defense counsel was ready for trial while McCartney would "not be ready for trial for a substantial period of time." The trial court also cited *People v. Watkins* (1992) 6 Cal.App.4th 595, 600 (*Watkins*) for the proposition that McCartney's inability to speak after his surgery and communicate with the judge and jury was another valid reason to be concerned about the delay caused by his self-representation. Finally, the trial court ruled that defense counsel's representation had not "been inadequate in any respect." The trial court denied McCartney's *Faretta* motion finding that the "reason for the lateness of the request by [McCartney] is specifically to delay the trial, delay the proceedings in an effort to frustrate the sending of the case out to trial."

The legal principles governing the granting or denying a *Faretta* motion are well settled. A trial court must grant a defendant's request for self-representation if the defendant is mentally competent and if such request is made knowingly, intelligently, unequivocally and in a timely manner. (*People v. Stanley* (2006) 39 Cal.4th 913, 931-932.) Erroneous denial of a timely unequivocal *Faretta* request is reversible per se. (*People v. Butler* (2009) 47 Cal.4th 814, 824.) In ruling upon the motion, the trial court should consider the quality of counsel's representation, the defendant's prior efforts to substitute counsel, the reasons for the request, the length and stage of the proceedings,

and the disruption or delay reasonably likely to result from granting the motion. (*People v. Mayfield* (1997) 14 Cal.4th 668, 810, quoting *Windham*, *supra*, 19 Cal.3d at p. 128.)

There is no fixed time before trial when a *Faretta* motion is considered untimely. As our Supreme Court explained in *People v. Lynch* (2010) 50 Cal.4th 693 (*Lynch*), overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-643, "timeliness for purposes of *Faretta* is based not on a fixed and arbitrary point in time, but upon consideration of the totality of the circumstances that exist in the case at the time the self-representation motion is made." (*Id*. at p. 724.) However, it is well established that when a defendant asserts the right to self-representation on the eve of trial, as McCartney did in this case, the court has discretion to deny the request. (See, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 102 [*Faretta* motion made moments before jury selection was set to begin was untimely and properly denied by the trial court]; *People v. Horton* (1995) 11 Cal.4th 1068, 1110 [*Faretta* motion made on date set for trial was untimely]; *People v. Frierson* (1991) 53 Cal.3d 730, 742 [*Faretta* motion made on the eve of trial was untimely and its denial was within the trial court's discretion].)

We conclude the trial court did not abuse its discretion in denying McCartney's *Faretta* motion because it was untimely, having been made on the day set for trial.[5] Granting McCartney's *Faretta* motion and allowing him to represent himself would have required a continuance of an undetermined length to allow him to recuperate after surgery, which McCartney admitted had not even been scheduled. "A trial court may properly consider the delay inherently caused by such uncertainty in evaluating timeliness. [Citations.]" (*Lynch*, *supra*, 50 Cal.4th at p. 728.) Additionally, when McCartney made his *Faretta* motion, this case was almost a decade old, causing the delay to be more burdensome than it might have been for a newly filed case. McCartney also indicated his post-surgery condition might render him incapable of speaking, which

---

[5] The fact that trial did not actually commence until May 9, 2011, is of no consequence. We review the denial of a *Faretta* motion based on the facts and circumstances known to the court at the time it ruled on the motion and do not consider unforeseen future events that delayed the start of trial. (*People v. Marshall* (1997) 15 Cal.4th 1, 24-25, fn. 2.)

would deprive him of the communication skills necessary to present a defense to the charges pending against him, creating even more uncertainty when trial could resume. (See *Watkins*, *supra*, 6 Cal.App.4th at p. 600 [defendant's speech impediment was so severe that he could not effectively communicate with the judge and jury, could not abide by rules of procedure and protocol, and was thus unable to represent himself].) In addition, the trial court had reason to believe McCartney was making his *Faretta* motion in order to obstruct the orderly administration of justice; and given McCartney's equivocal response when asked how long it would take him to prepare for trial, that would have been the inevitable outcome of granting his request for self-representation. Consequently, given the totality of the circumstances, we conclude the trial court did not abuse its discretion in denying McCartney's motion to represent himself.

In his petition for writ of habeas corpus, McCartney claims his counsel's "disloyal and reprehensible actions" thwarted his intention to assert his right to represent himself in a timely manner several weeks prior to trial. McCartney indicates that several weeks before trial was scheduled to begin, he informed his counsel that he wished to represent himself; but instead of informing the court at the March 25 pretrial hearing to continue the matter for further defense investigation, counsel waived McCartney's appearance.[6] McCartney claims, "Had counsel informed the court, as he was duty bound to, on March 25, that McCartney wished to represent himself, [McCartney]'s motion for self representation *would have been required to be granted*." (Italics added.) This argument is completely unsubstantiated because the record reveals exactly what the trial court would have done if McCartney's request to represent himself had been made on March 25, 2011.

When the trial court denied McCartney's self-representation request, the court responded to McCartney's claim that he was in the courthouse in a holding cell on

---

[6] McCartney's insinuation that defense counsel orchestrated a plot to keep McCartney out of the courtroom on March 25, 2011, in order to deny him the right to represent himself finds no support in the record, no matter how carefully the record is scrutinized.

9

March 25, 2011, the date defense counsel waived his appearance and the court found good cause to continue the trial. McCartney claimed that if he had been brought to court, he would have made his *Faretta* motion earlier. However, the court indicated McCartney would have been "in the same position" even if he had been brought to court on March 25, 2011, and had made a request at that time to defend himself. The primary reason that the trial court denied McCartney's request to represent himself was that it would have created indefinite delay and disruption in the proceedings because he had not even scheduled his upcoming surgery and had no timeline or prognosis for his recovery. The factors which moved the court to deny McCartney's *Faretta* motion on the day of trial would have been equally applicable if McCartney's motion for permission to represent himself had been made on March 25, 2011, and the trial court indicated it would have reached the same result.

A court may deny a *Faretta* motion made weeks before trial, coupled with a request for a continuance, which would have the effect of creating substantial delay in "[a] case that had endured significant delay [and] was finally nearing resolution."[7] (*Lynch*, *supra*, 50 Cal.4th at p. 727.) Consequently, even assuming arguendo that defense counsel should have brought McCartney's intention to represent himself to the court's attention on March 25, 2011, McCartney cannot demonstrate a reasonable probability that, but for the error, the result would have been different.

---

**7** In *Lynch*, the court considered a *Faretta* motion filed two weeks before pretrial motions were to begin and trial was set to begin "about three weeks after that." (*Lynch*, *supra*, 50 Cal.4th at p. 727.) The case involved multiple counts and special circumstance allegations, requiring an estimated 65 prosecution witnesses, some elderly. (*Ibid.*) The case was nearly four years old; and, although the court found the delay "cannot be attributed to [the] defendant, he did not thereby escape any responsibility for timely invoking his right to self-representation." (*Ibid.*) The defendant "would have required an undetermined amount of time to investigate and prepare for trial." (*Id.* at p. 728.) In light of all of these circumstances, our Supreme Court affirmed the trial court's denial of the defendant's *Faretta* motion as untimely in "[a] case that had endured significant delay [and] was finally nearing resolution." (*Id.* at p. 727.)

### *2. Ineffective Assistance of Counsel—General Principles*

On appeal, McCartney principally argues defense counsel's numerous errors and omissions deprived him of effective representation of counsel and a fair trial. A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice. (*People v. Ledesma* (1987) 43 Cal.3d 171, 217-218 (*Ledesma* ); *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) " 'The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Ledesma*, *supra*, at pp. 217-218.) A court deciding an ineffective assistance claim does not need to address the elements in order, or even to address both elements if the defendant makes an insufficient showing on one. (*Strickland*, *supra*, at p. 697.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Ibid.*)

As our Supreme Court recently held in *People v. Mai* (2013) 57 Cal.4th 986, "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*Id*. at p. 1009.)

McCartney has also filed a petition for a writ of habeas corpus, which we have ordered consolidated with his appeal, in which he repeats many of the assertions made on appeal and during his numerous *Marsden* motions. "An appellate court receiving [a petition for a writ of habeas corpus] evaluates it by asking whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief. [Citations.] If no prima facie case for relief is stated, the court will summarily deny the petition. If, however, the court finds the factual allegations, taken as true, establish a prima facie case for relief, the court will issue an OSC [order to show cause]. [Citations.]" (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475.) Pursuant to our request,

respondent has filed an informal response to assist us in our determination of whether a prima facie case has been stated. (See Cal. Rules of Court, rule 8.385(b); *People v. Romero* (1994) 8 Cal.4th 728, 737.) (Order, Jan. 24, 2014, Rivera, Acting P. J.)

In order to state a prima facie case of ineffective assistance of counsel, a defendant must plead with particularity facts, and provide reasonably available documentary evidence, that if true, show " 'both (1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome. [Citations.]' [Citations.]" (*In re Scott* (2003) 29 Cal.4th 783, 811.)

McCartney's criticism is largely directed to trial counsel's investigation and tactical choices.[8] "[T]he range of constitutionally adequate assistance is broad, and a court must accord presumptive deference to counsel's choices about how to allocate available time and resources in his or her client's behalf. [Citation.] Counsel may make reasonable and informed decisions about how far to pursue particular lines of investigation. Strategic choices based upon reasonable investigation are not incompetent simply because the investigation was less than exhaustive. [Citation.]" (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1252, superseded by statute on another ground as stated in *In re Steele* (2004) 32 Cal.4th 682, 691; *In re Andrews* (2002) 28 Cal.4th 1234, 1254 ["valid strategic choices are possible even without extensive investigative efforts"].)

In other words, different counsel may choose to conduct investigations in different ways, and it is for counsel, not this court, to decide how to obtain the information needed to prepare adequately for trial. (See *In re Hall* (1981) 30 Cal.3d 408, 425 [declining to criticize counsel for electing to forego use of trained investigator]; *People v. Bolin*

---

[8] We have not been provided with a declaration of defense counsel which would give us the reasons for the numerous tactical decisions challenged by McCartney in this appeal and in his petition for writ of habeas corpus. However, we do have the transcripts of the numerous *Marsden* motions brought by McCartney which provide useful insight into counsel's decision making in preparing and defending McCartney at trial.

12

(1998)18 Cal.4th 297, 334 (*Bolin*) [declining to criticize counsel for lack of attack in cross-examining the prosecution's expert witnesses and the failure to call defense experts].)  "What matters is the substance of the investigation—whether counsel in fact explored those avenues reasonable counsel would have pursued in light of what was known and in light of the chosen defense strategy."  (*In re Thomas* (2006) 37 Cal.4th 1249, 1264.)

### 3. DNA Testing

In petitioning for habeas corpus, McCartney argues his counsel should have mounted a much more aggressive defense in refuting the DNA evidence introduced against him at trial.  McCartney contends that if counsel had conducted further investigation and submitted additional evidence, he could have proven "the calculations regarding the DNA were substantially flawed."

McCartney was first identified as the perpetrator of this offense by a "cold hit" match of crime scene samples with the DNA profiles of 567,403 offenders.  At trial, criminalist Tahnee Nelson testified that she performed a DNA analysis in May 2009 comparing saliva taken from McCartney to the contents of Claudia's rape kit.  This analysis demonstrated that a vaginal swab collected after the sexual assault contained a sperm DNA profile which matched McCartney's.

However, where DNA evidence is used to help solve a crime, the fact that a match is found between the defendant's DNA and that of biological specimens left at the crime scene is only half the story; the other half is the statistical probability that a similar match would be found with the DNA of any randomly selected individual.  (See *People v. Venegas* (1998) 18 Cal.4th 47, 82 ["The evidentiary weight of the match with the suspect is therefore inversely dependent upon the statistical probability of a similar match with the profile of a person drawn at random from the relevant population."].)  The pivotal question has been framed by our high court as follows:  "Given that the suspect's known sample has satisfied the 'match criteria,' [i.e., matches at each allele tested,] what is the probability that a person chosen at random from the relevant population would likewise

13

have a DNA profile matching that of the evidentiary sample?" (*People v. Soto* (1999) 21 Cal.4th 512, 523, fn. omitted.)

At trial, the prosecution presented statistical evidence showing how often the DNA profile would occur at random among unrelated African-Americans, Hispanics, and Caucasians. Nelson testified that the probability that the sperm sample taken from the rape kit did not come from appellant was: "approximately 1 in 22 billion for U.S. Caucasians, 1 in 34 billion for African Americans; 1 in 179 billion for California Hispanics; and 1 in 66 billion for general Asians."

McCartney claims his defense counsel was constitutionally ineffective in failing to conduct additional investigation regarding the DNA evidence that would have called Nelson's testimony into question. But, as characteristic of McCartney's arguments on appeal and in support of habeas corpus, he myopically focuses on what counsel did not do and ignores what was done.

In support of his petition for habeas corpus, McCartney has submitted evidence showing that on June 15, 2010, long before trial, the defense team contacted an independent lab, Technical Associates, Inc. (TAI), indicating the defense wanted TAI to review the work done by the SFPD Crime Lab and then, "depending on the results wanted to discuss . . . whether items of evidence should be retested."[9] After numerous discussions between TAI and the defense investigator, TAI later received additional discovery materials "including the sexual assault kit medical report . . . ."

Based on counsel's response during a *Marsden* hearing, the TAI's initial findings did not serve to exclude McCartney as a potential contributor. In response to McCartney's accusation that defense counsel had not adequately investigated the DNA evidence, counsel explained, "Unfortunately, the information [that] came back [from TAI] helps the prosecution and not him. He has rested a tremendous amount of faith on

_____

[9] In support of McCartney's petition for habeas corpus, he has submitted the declaration of Marc Scott Taylor, the "President and Laboratory Director of the forensic science laboratory of Technical Associates, Inc." This declaration sets out all of TAI's interactions with the defense team in preparation for trial and provides a helpful chronology of pertinent events.

this issue, but, yet, when we send it out for testing, it turns out it hurts him more than helps him."

Representatives of the defense team, including defense counsel, had a telephone conference with TAI on March 8, 2011, during which TAI stated that further testing and analysis could be done, such as Y-STR testing "to determine if a second male profile was present in the vaginal sample . . . ." Defense counsel was given an estimate for the Y-STR testing. which would have cost approximately $3,600. Furthermore, the police laboratory compared 9 autosomai loci; and TAI informed defense counsel "there was substantial additional DNA available that would have allowed testing additional autosomai loci for a total of 13 to 15 loci" which "would be very likely to reveal if the 9-locus match to the defendant was simply coincidental or likely to be because he was the source of the evidence."

Defense counsel ultimately did not request further testing be done. Instead, defense counsel arranged for a forensic DNA analyst from TAI to come to San Francisco to help him prepare a defense to the DNA evidence and sit in the courtroom during testimony from the prosecution's expert. On May 15, 2011, a TAI forensic scientist did, in fact, travel to San Francisco and spent a day preparing defense counsel for the trial, and accompanied him to the court the next day.

Given this record, McCartney has failed to establish a prima facie case that his trial counsel was ineffective for failing to secure additional DNA testing or that he was prejudiced in any way by trial counsel's choices in this regard. Counsel's strategy to forego a wholesale attack on the statistical analysis of the DNA evidence and instead concentrate his time and resources on getting expert assistance so that he could effectively rebut the DNA evidence at trial, was well "within the permissible range of competent representation." (*People v. Freeman* (1994) 8 Cal.4th 450, 498.)

As to the prejudice prong of the *Strickland* inquiry, McCartney offers no evidence to suggest that additional analysis of the DNA evidence in this case would have

15

exonerated him of these charges.[10]  Instead, McCartney claims if counsel had been effective, he would have secured the necessary funding in order to get additional testing and "Tahnee Nelson could have been cross-examined in a way in which she would have had to admit the distinct possibility of a coincidental match or admit that the random probability was not the astronomical 1 in 34 billion that she testified to but rather 1 in 60,000."

Based on the overwhelming evidence of McCartney's guilt in this record, we conclude he has failed to demonstrate " 'a reasonable probability' " that *even if* he had proven that, in fact, there was a 1 in 60,000 chance his DNA matched the perpetrator's " 'the result of the proceeding would have been different. . . .' [Citations.]" (*Bolin*, *supra*, 18 Cal.4th at p. 333.)  After all, a 1 in 60,000 probability of matching characteristics is still infinitesimally small.  That fact, combined with Claudia's 100 percent positive identification of McCartney as the perpetrator, the similarities between the police sketch based on Claudia's description and McCartney's mug shot, and McCartney's prior sex offense in the same geographic proximity as Claudia's kidnapping and rape, would have provided the jury with more than enough evidence to convict McCartney of the charged crimes.  Thus, McCartney's ineffectiveness claim related to the DNA testing fails.

### 4. Investigation of McCartney's 1998 Sex Offense Conviction

On appeal and in support of his petition for habeas corpus, McCartney claims that defense counsel was ineffective in failing to investigate the circumstances surrounding

---

[10]  In this regard, we note that the DNA analyst who testified in this case, Tahnee Nelson, was involved in a widely publicized mix-up of DNA samples.  The defense team provided TAI media reports involving the incident, along with records from the San Francisco District Attorney's Office, and audits done by the accreditation agency and the Federal Bureau of Investigation.  TAI concluded "the specific incident in question does not appear to impact this case directly . . . ."  In response to a *Marsden* inquiry, defense counsel indicated, "I have no basis upon which to substantiate" Tahnee Nelson's testing in this case was deficient.  Defense counsel indicated, "I can't say it any stronger.  If I had that suspicion, I would have made a motion or I would have made a complaint."  Therefore, there is nothing in this record to indicate that the SFPD Crime Lab procedures were systemically flawed or that the testing in this case was unreliable.

the prior sexual offense introduced at trial—his 1998 sexual encounter with Crystal at the Mission Inn which resulted in his plea to unlawful sex with a minor.[11]  (§ 261.5, subds. (a), (c).)  He claims counsel was ineffective in failing to present defense evidence that would have "substantially impeached" Crystal's testimony.  Specifically, McCartney complains defense counsel should have located and called the desk clerk at the hotel, who purportedly would have testified that during her encounters with Crystal and McCartney on the evening of the sexual assault, Crystal did not appear to be distraught or in any danger.

In support of habeas corpus, McCartney has secured the declaration of the public defender, now San Francisco Superior Court Judge Bruce Chan, who represented McCartney when he was charged in the 1998 case.  In his declaration, Judge Chan indicates that during his representation of McCartney he uncovered facts which suggested the incident between McCartney and Crystal was consensual.  He put on a defense witness at the preliminary hearing, "something that [he] rarely did"—the hotel manager on duty at the Mission Inn when McCartney and Crystal obtained a room.  According to the hotel manager's preliminary examination testimony, she observed Crystal when the couple checked into the hotel, one half-hour later when Crystal came to the desk alone asking to use the telephone, and when the couple checked out the next morning.  At no time did Crystal appear to be afraid or in any danger.  McCartney claims that a competent attorney would have located this witness, as well as other individuals who provided information to McCartney's defense in the 1998 case, and would have had them "ordered into court" to "provide the testimony that would have substantially impeached Crystal['s] testimony" that she was the victim of a violent sexual assault.

The record belies McCartney's claim that "trial counsel knew that [McCartney] had been convicted in 1998 of unlawful intercourse . . . yet [h]e had done nothing to

---

[11] The defense filed a written motion opposing the admission of this evidence, arguing it should be excluded under Evidence Code section 352 because the charged and uncharged conduct was not similar.  The trial court ruled the evidence admissible.  This ruling has not been challenged on appeal.

attempt to view the [public defender's] file or to learn anything about the facts of that case." We cannot fault counsel for his failure to secure the public defender's file, which contained the results of the public defender's investigation. As defense counsel explained at a series of *Marsden* hearings beginning on May 13, 2011, he spoke to Judge Chan about the 1998 offense and his investigator ordered the case file from the San Francisco Public Defender's Office. He later spoke to Judge Chan again, who told defense counsel how to expedite his request for the file. Nonetheless, despite his investigator's "numerous attempts and requests," he was unable to secure a copy of the file. In fact, a supervisor at the public defender's office informed the investigator that the case file had been lost or destroyed—a fact independently confirmed by the trial court when it "requested the assistance of a senior administrator in that office" in locating the file. Apparently, Judge Chan was later able to secure the case file. But this does not prove that defense counsel's efforts to obtain a copy before the trial were inadequate.

McCartney boldly declares that if he had been represented by competent counsel, rebuttal evidence would have been presented and "[t]he testimony of Crystal would have been so substantially diminished, because of her lack of credibility that the jury would have likely believed that the sexual encounter had been engaged in with consent." However, a finding of prejudice from ineffective assistance cannot be premised on unsupported conclusions about the value of this evidence. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1177 [a defendant must prove prejudice as a "demonstrable reality," not simply speculate what was the effect of counsel's errors or omissions].)

It is pure conjecture to conclude that this evidence would have produced anything that would have caused the jury to reject Crystal's account of the pertinent events. Nothing the hotel manager would have offered directly undercuts Crystal's general allegations that she voluntarily went to a hotel room with McCartney to call her boyfriend, but after she returned to the room after attempting to use the telephone at the front desk, she was threatened and sexually assaulted. In other words, even if there had been a consensual interaction at some earlier point, Crystal testified that the sexual relationship was nonconsensual. The hotel manager would not have been able to provide

18

testimony on the pivotal issue of whether consensual or nonconsensual sexual intercourse had occurred behind closed doors.

In any event, even if the defense had put on sufficient evidence to convince the jury that Crystal willingly engaged in sex with McCartney at the Mission Inn in 1998, it is not reasonably probable that fact alone would have undercut the probative force of the overwhelming evidence in this case showing that McCartney brutally raped Claudia three years later. Therefore, McCartney has failed to carry his burden to show defense counsel's failure to investigate and obtain the potentially impeaching evidence was prejudicial within the meaning of *Strickland*—that is, there is not a reasonable probability that the outcome would have been more favorable to defendant in the absence of his counsel's purported errors and omissions. (*Strickland*, *supra*, 466 U.S. at p. 687.)

In a separate claim of error, we conclude the trial court did not abuse its discretion in denying defense counsel's motion for a continuance, which was made on May 9, 2011, the day set for trial, so that defense counsel could have additional time to investigate the prior sexual offense involving Crystal. Because defense counsel was provided identifying information regarding Crystal several weeks before trial, the record does not show the trial court abused its discretion in denying his request for a continuance. (See, e.g., *People v. Reaves* (1974) 42 Cal.App.3d 852, 856 ["a trial court does not abuse its discretion when it refuses to grant such motion for a continuance which is made on the very day of trial"]; *People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 [trial court properly denied "last-minute" motion to continue].)

Furthermore, although defense counsel's requests to continue the trial from its original May 9, 2011 date was denied, Crystal did not testify until May 13, 2011. Thus, it does not appear defendant was prejudiced by the trial court's denial of his request for a continuance. (See *People v. Mendoza* (1974) 37 Cal.App.3d 717, 722 [in action for sexual assault on minor, no abuse of discretion or prejudice in denying continuance where defendant had four days to prepare for testimony regarding prior similar assault].)

19

## 5. *Failure to Seek Exclusion of Victim's Identification*

On direct appeal and in seeking writ relief, McCartney contends that defense counsel was constitutionally ineffective in failing to seek exclusion of Claudia's eyewitness identification testimony because it was the product of an impermissibly suggestive procedure. He argues, "[c]ounsel, at least from the preliminary examination onward, knew that the District Attorney and police had told Claudia that the person who had raped her would be in court at the preliminary examination." McCartney goes on to claim that in light of this information, "[r]easonably competent counsel would have known, at least since the preliminary examination that the initial identification of petitioner by Claudia . . . was the result of an unconstitutional and improperly suggestive identification procedure which violated due process and would be subject to suppression . . . ."[12]

Turning first to the prejudice prong of *Strickland*, McCartney has not shown a reasonable probability that a motion to suppress would have resulted in the exclusion of the victim's identification of him as the perpetrator of these offenses. Had defense counsel moved to suppress the victim's eyewitness identification and if the trial court had ruled that the pretrial identification procedure was unnecessarily suggestive, the burden would have shifted to the prosecution to establish that the victim's identification of defendant had a source independent of, and untainted by, the suggestive pretrial identification procedure. (See *People v. Citrino* (1970) 11 Cal.App.3d 778, 783; *People v. Rodriguez* (1977) 68 Cal.App.3d 874, 881.) To establish this, the prosecution would have had to convince the trial court that, despite the unnecessarily suggestive in-court identification procedure, Claudia's identification of McCartney as the person who sexually assaulted her was reliable under the totality of the circumstances. In examining the totality of the circumstances, the court would have had to take into account such

---

[12] We note that at trial, in attempting to raise doubts about the accuracy of Claudia's identification, defense counsel brought to the jury's attention that Claudia was told that the person who was in the courtroom was the person whose DNA matched the person who sexually assaulted her.

20

factors as the amount of time that elapsed between the crime and the identification procedure, her opportunity to view her assailant at the time of the crime, and her degree of attention, accuracy of prior description, and level of pretrial identification certainty. (See *Neil v. Biggers* (1972) 409 U.S. 188, 199-200; *People v. Cooks* (1983) 141 Cal.App.3d 224, 306.)

A review of the these factors supports a conclusion that the victim's identification of McCartney had an origin that was independent of the unduly suggestive pretrial identification procedure and therefore would have been admissible, even if a motion to suppress her identification had been made. First, Claudia had ample opportunity during the time that McCartney was threatening her and raping her to observe his facial features, his build, and his clothing. Second, Claudia was not impaired or incapacitated in any way during the prolonged attack. Third, Claudia provided a very detailed description of her assailant to police immediately after the rape. Key parts of that description matched McCartney. Claudia described her attacker as a 20 to 26-year-old Black male; McCartney was a 27-year-old Black male. Claudia's eyewitness identification resulted in a sketch artist making a drawing of the perpetrator. While there are arguable differences between McCartney's mug shot taken the next day and the drawing based on Claudia's description, the mug shot and sketch share several similarities, including similar haircuts, eyes, lips, chins, cheekbones, and forehead. Fourth, Claudia expressed the highest possible degree of certainty in her identification. Upon consideration of these factors, the mere fact that an impermissibly suggestive in-court identification took place years later would not have led the trial court to grant a suppression motion.

McCartney also contends that he received ineffective assistance of counsel when his counsel failed to present an expert witness on the reliability, or lack thereof, of eyewitness testimony. He claims reasonably competent counsel would have "call[ed] an expert who could have assisted the jury, and provided scientific evidence, regarding the vagaries of eyewitness identification." We have no evidence in this record regarding trial counsel's thought process, if any, on the subject of retaining such an expert for this case. Furthermore, McCartney does not explain in any detail what significant evidence would

21

have been adduced had such an expert been retained, especially given the fact that Claudia's eyewitness identification was independently corroborated by DNA evidence. (See *People v. Lucas* (1995) 12 Cal.4th 415, 448, fn. 5 [in claiming ineffective assistance by failing to consult experts, the defendant must "do more than surmise that defense experts *might* have provided more favorable testimony"].)  Moreover, the jury was instructed on the factors that could potentially affect the accuracy of Claudia's identification.  (CALCRIM No. 315.)  Under these circumstances, trial counsel could have reasonably concluded the testimony of an eyewitness expert was not necessary.

### 6. *Failure to Renew Motion to Dismiss for Delay in Bringing Charges*

McCartney next criticizes defense counsel's failure to renew his motion to dismiss the kidnapping and rape charges because of the prosecutorial delay in filing charges.  He claims "there was no justification for the delay in prosecuting [him] from October, 2006, when the cold hit was made, until [he] was brought to court on December 29, 2009."  Furthermore, he claims he was prejudiced by the delay because he had no memory of the critical events and a "percipient witness" died in 2007.  He indicates "it is reasonably probable that a renewed motion to dismiss would have been successful."

Before the preliminary hearing, on April 16, 2010, defense counsel filed a motion seeking dismissal of this case, arguing the charges had been "unreasonably delayed, violating [McCartney's] right to due process."  (See generally *People v. Cowan* (2010) 50 Cal.4th 401, 430 (*Cowan*).)  The motion noted that the crime had occurred on October 4, 2001, and police had waited until November 2009 to arrest McCartney, even though a DNA cold hit identified him as a suspect around 2006 and his whereabouts were known to police.  The motion to dismiss indicated that as a result in the delay of prosecution "witnesses or evidence has been lost and memories fade over time."

The prosecution filed its opposition on April 30, 2010.  The opposition set out the efforts of both San Francisco Police Department Inspector Brian Delahunty and Lieutenant Dan Leydon to locate Claudia after the cold hit in 2006.  From November 2006 until the end of January 2007, Inspector Delahunty: (1) tried Claudia's phone number from 2001 but found it had been disconnected; (2) went to her last known

22

address; (3) went to her previous place of employment and asked her former coworkers about her whereabouts; (4) performed a Lexis-Nexis search; and (5) contacted Bay Area Legal Aid, her previous attorneys, and the Mexican consulate. These efforts were unsuccessful.

When Delahunty was transferred to another division in November 2008, the case was assigned to Lieutenant Leydon. Leydon tried all the phone numbers for Claudia's family, but the numbers were either wrong or had been disconnected. After contacting Interpol, Leydon reached out to Claudia's last known employer, and received a response from an employee who remembered her. The employee gave Leydon a possible phone number for Claudia in Mexico, but he was unable to reach her. Eventually, in March and April 2009, Leydon worked with the Victim Services Unit of the San Francisco District Attorney's Office to locate Claudia. Shortly thereafter, Claudia contacted the Victim Services Unit, and Leydon was able to meet with her.

When the motion to dismiss was argued on May 4, 2010, defense counsel argued that his client was prejudiced by the delay by indicating there was a man who saw Claudia being kidnapped, and who then called 911 and identified the kidnapper as "a Mexican," while McCartney is African American. The witness was now deceased. The trial court denied the motion to dismiss without prejudice, ruling that the loss of the witness who saw Claudia being kidnapped was not "sufficient to justify the granting of a [motion to dismiss]."

When the case was tried, the jury was made aware of the deceased witness's description of the attacker. On cross-examination, defense counsel questioned Officer Rivera about the description given by the man who had witnessed the kidnapping, and he testified that the witness had described the perpetrator as a Hispanic male about 35 years old. The jury was also given information from the 911 call reporting a "Hispanic male dragging a female across Mission Street."

We reject McCartney's argument that competent counsel, bringing a renewed motion to dismiss, should have been able to show "the prosecution's claim of Herculean efforts in locating Claudia was a sham." His argument that had the police conducted a

23

more diligent investigation, the case against him would have been filed earlier amounts to merely challenging the police department's allocation of its investigative resources. (*People v. Abel* (2012) 53 Cal.4th 891, 911 (*Abel*).) "A court may not find negligence by second-guessing how the state allocates its resources or how law enforcement agencies could have investigated a given case. . . . Thus, the difficulty in allocating scarce prosecutorial resources (as opposed to clearly intentional or negligent conduct) [is] a valid justification for delay. . . .' [Citation.]" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1256-1257; *Abel*, *supra*, at p. 911.)

We also reject McCartney's claim that in a renewed motion, "[c]ounsel would have been able to demonstrate prejudice from the delay." In considering the original motion, the trial court found the prosecutorial delay was fully justified and outweighed McCartney's claim of prejudice from the loss of the witness who saw Claudia being kidnapped. Moreover, the court took special effort to minimize the prejudice McCartney suffered from the interim death of the eyewitness. The jury was made aware of his description of the assailant, which differed from McCartney's racial and ethnic identity. It is not our function on appeal to reweigh the evidence and make an independent determination of prejudice if the trial court's finding is supported by substantial evidence. (*Cowan*, *supra*, 50 Cal.4th at p. 431.)

Based upon the court's denial of the original motion to dismiss, which was legally sound and factually supported, defense counsel could have reasonably concluded renewal of the motion to suppress would be futile. (*People v. Memro* (1995) 11 Cal.4th 786, 834 [defense counsel need not waste the court's time with futile motions]; *People v. Harpool* (1984) 155 Cal.App.3d 877, 886 [counsel is not required to make futile objections or motions merely to create a record impregnable to assault for claimed inadequacy of counsel].) Therefore McCartney's ineffective assistance of counsel claim fails.

### 7. *Investigation of McCartney's Mental Health History*

In his petition for writ of habeas corpus, McCartney contends that defense counsel was constitutionally ineffective for failing to investigate his mental health history. According to McCartney "it is clear beyond any possible doubt that trial counsel failed to

24

properly investigate [McCartney's] mental health history, and failed to present readily available information that would have suggested to the court that [he] was incompetent to stand trial."

According to the defense investigator's notes, which are before this court as an exhibit to the petition for writ of habeas corpus, McCartney's parents told the investigator in the beginning of 2010 that McCartney had previously received treatment for clinical depression, had been diagnosed with bipolar disorder, and had been prescribed Lithium, Wellbutrin, and Hydroxyzine Pamoate. Based on the investigator's request on November 9, 2010, the California Department of Corrections and Rehabilitation (CDCR) sent her McCartney's medical records, which indicated that he had been discharged from the military because of Post-Traumatic Stress Disorder (PTSD) and had requested accommodations during parole revocation hearings.

On May 5, 2011, the day set for trial, defense counsel declared a doubt as to McCartney's competence to stand trial.[13] Defense counsel stated that his doubt was based on "information that has been communicated to me by my client regarding some interaction he had with a mental health professional while in custody." McCartney himself told the trial court that he had delusional thoughts about defense counsel, that he was having PTSD-like symptoms in jail, and that his symptoms could be treated with Lithium (a mood stabilizer), Prozac (for depression), and Sinequan Doxepin or Thorazine (for paranoid thinking). The trial court declined to declare a doubt as to McCartney's competence, finding no "basis for me to do so in good faith." The trial court gave

[13] Our state statute provides that a person is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (§ 1367, subd. (a).) We note that McCartney's argument that there was reason to doubt his competence to stand trial is manifestly inconsistent with his assertion that he was competent to waive the assistance of counsel under *Faretta*. (See *People v. Johnson* (2012) 53 Cal.4th 519, 530 [trial courts may deny a self-representation request when "the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel"].)

25

defense counsel leave to pursue additional funding from the designated judge for psychiatric assistance, but noted that the trial court itself was precluded from doing so by rules implemented in the wake of the California courts budget crisis. The trial court did, however, authorize a section 4011.6 mental health evaluation for McCartney.

McCartney faults defense counsel for not further investigating his mental health history and for not specifying his prior diagnoses in raising a doubt as to McCartney's competence. However, when defense counsel was asked during one of the *Marsden* hearings to respond to McCartney's allegation that he was not pursuing a mental health defense, counsel indicated there was "no basis for any kind of a mental defense in this case."

In his petition for habeas corpus, McCartney claims defense counsel's assessment was wrong and that mental health issues should have been pursued as part of a competent defense. However, McCartney has failed to provide reasonably available documentary evidence of psychiatric examinations or evaluations by qualified medical experts in support of his claim that any reasonably competent counsel would have mounted a mental health defense to these charges. (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [speculative claims must be supported with reasonably available documentary evidence]; *In re Harris* (1993) 5 Cal.4th 813, 827, fn. 5.) He also ignores the contemporaneous record from the trial where defense counsel raised the issue, but the judge rejected his claim of mental incompetence. In denying one of the many *Marsden* motions brought by McCartney, the judge was openly skeptical of McCartney's claimed incompetence. The court observed McCartney has "been logical, continuous, reasonable and articulate. And his personal performance before the Court dispels any assertion of incompetence by him at any time during the trial." Accordingly, his claim can be summarily denied for failure to state a prima facie case for habeas relief.

### 8. *Investigation of McCartney's Alibi*

During a *Marsden* hearing held on May 13, 2011, McCartney complained that the defense team had failed to develop an alibi for his whereabouts during the crime. He claimed his former girlfriend would testify that he was with her, in their shared

26

apartment, at the time the incident took place at 4:30 a.m. on October 4, 2001. He also claimed his mother would testify that he attended a birthday dinner for her the prior evening in San Francisco.

The record does not support McCartney's assertion that his counsel "did very little, if anything, to locate the alibi witnesses" that would have substantiated his alibi defense. Both of these potential alibi witnesses were contacted and interviewed by the defense. However, neither of them expressed a willingness to come forward to give testimony that would have been beneficial for McCartney. If anything, the record shows they were extremely reluctant to be involved in this case.

With respect to McCartney's former girlfriend, the defense investigator drove to Sacramento to speak to her, but her mother refused to give any contact information to the investigator. The investigator gave the mother her card and asked that the potential witness call her. However, the former girlfriend never called the defense investigator and failed to respond to the investigator's numerous attempts to contact her. McCartney does not suggest what additional steps his defense counsel should have taken to secure his former girlfriend's cooperation.

With regard to McCartney's mother, the defense investigator contacted her, but she "was not willing and is not willing to step forward and say" her birthday dinner in San Francisco had occurred October 3, 2001, the night before the crime. More importantly, as defense counsel noted to the trial court during a *Marsden* hearing, the fact that McCartney was at a family dinner in San Francisco the night before the crime was committed would not have precluded him from kidnapping and raping Claudia between 4:30 a.m. and 7:00 a.m. the next day. Counsel indicated that he never thought that to be an alibi since "the idea that the alibi for the evening would cover the early morning hours doesn't make any sense."

In order to prevail on a claim of ineffective assistance of counsel for failure to call a witness, "there must be a showing from which it can be determined whether the testimony of the alleged additional defense witness was material, necessary, or admissible, or that defense counsel did not exercise proper judgment in failing to call

27

him. [Citation.]" (*People v. Hill* (1969) 70 Cal.2d 678, 690-691; *In re Noday* (1981) 125 Cal.App.3d 507, 522.) It is doubtful that McCartney's former girlfriend, who he was counting on to establish his whereabouts at the time of the crime, would have been a cooperative witness for McCartney. No affidavits or declarations have been submitted from any of these potential witnesses setting forth what evidence they would have provided had they been called at trial. (*Bolin*, *supra*, 18 Cal.4th at p. 334 [" 'claims must be supported by declarations or other proffered testimony establishing both the substance of the omitted evidence and its likelihood of exonerating the accused' "]; compare *In re Sixto* (1989) 48 Cal.3d 1247, 1262-1263 [to support habeas corpus relief, declarations were submitted from potential witnesses who were willing to testify at trial but who had not been contacted by trial counsel].) No showing has been made how McCartney was prejudiced; consequently, his claim of ineffective assistance of counsel for failing to investigate and present an alibi defense is meritless.

### 9. *Modification of Language in CALCRIM No. 315*

McCartney also contends that his defense counsel was ineffective for failing request that the "certainty factor" be excised from CALCRIM No. 315, which provides that an eyewitness's subjective certainty can be considered as a factor in evaluating the accuracy of the eyewitness identification. That factor, one of 14 listed to assist the jury in evaluating eyewitness testimony, asks the jury to consider "[h]ow certain was the witness when he or she made an identification?" McCartney claims modification of CALCRIM No. 315 should have been sought in light of the scientifically documented lack of correlation between a witness's certainty in his or her identification of someone as the perpetrator of a crime and the accuracy of the identification.

McCartney's argument presumes that if a proper objection had been made, the trial court would have been required to eliminate the "witness certainty" language from the instruction. But numerous courts, including the California Supreme Court, have addressed the predecessor to CALCRIM No. 315's eyewitness identification instruction, CALJIC No. 2.92 and upheld the "certainty" factor. (See *People v. Ward* (2005) 36 Cal.4th 186, 213 [no sua sponte obligation to modify the witness certainty language of

28

CALJIC No. 2.92]; *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232 [holding the "trial court did not err . . . in instructing the jury on the 'certainty' factor"]; *People v. Wright* (1988) 45 Cal.3d 1126, 1141 [holding CALJIC No. 2.92 "will usually provide sufficient guidance on eyewitness identification factors" and it is generally proper for a court to give CALJIC No. 2.92 after providing defense counsel an opportunity to suggest additional factors].)

In light of this precedent, even McCartney acknowledges any objection of the giving of this instruction "would have likely been futile." We therefore conclude defense counsel was under no obligation to request a modification to CALCRIM No. 315 to remove the "certainty" factor because the instruction has repeatedly been upheld against legal challenge.

### 10. Trial Court's Denial of Marsden Motions

Finally, McCartney claims he should have been allowed to remove his defense counsel and have another attorney appointed to represent him under *Marsden*. He claims "[b]y any standard it should have been clear to the court that trial counsel had done very little to prepare [McCartney's] case for trial, was not ready for trial, and had become embroiled in such an irreconcilable conflict that ineffective representation was likely to result."

A trial court's duties under *Marsden* are fully performed when it affords the defendant the opportunity to present grounds for the motion. (*People v. Huffman* (1977) 71 Cal.App.3d 63, 80-81 (*Huffman*).) Trial judges are particularly well-suited to rule on the adequacy of counsel in criminal cases tried before them, and the court is entitled to accept counsel's version of events to the extent there is a credibility question between defendant and counsel at a *Marsden* hearing. (*People v. Smith* (1993) 6 Cal.4th 684, 696.) When the court gives the defendant the opportunity to fully state the grounds for dissatisfaction with counsel, its ruling on a request for substitution will not be reversed absent an abuse of discretion. (*People v. Moore* (1988) 47 Cal.3d 63, 76; *People v. Silva* (1988) 45 Cal.3d 604, 622.)

At each of the numerous *Marsden* hearings conducted in this case, the trial court fulfilled its duty to allow McCartney to present his grievances, which largely centered on complaints that counsel had failed to bring certain pretrial motions, had failed to visit him as often as McCartney believed necessary, had failed to investigate and pursue potential defenses and witnesses, and failed to obtain McCartney's approval in formulating trial strategy. Trial counsel responded to each of McCartney's criticisms. At the conclusion of each *Marsden* hearing, the court found no basis for substituting counsel. The trial court did not believe any conflict between McCartney and counsel was an irreconcilable conflict.[14] By giving McCartney ample opportunity to present and support his charges against his counsel, the court fully performed its duties under *Marsden*. (*Huffman*, *supra*, 71 Cal.App.3d at pp. 80-81.)

Moreover, we can confidently say the trial court did not abuse its discretion in refusing to discharge counsel. A *Marsden* motion should only be granted where the defendant has made "a substantial showing that failure to order substitution is likely to result in constitutionally inadequate representation." (*People v. Crandell* (1988) 46 Cal.3d 833, 859, overruled on other grounds in *People v. Craytor* (2002) 28 Cal.4th 346, 364-365.) We note that in making his *Marsden* motions, McCartney principally raises the same issues that have been discussed and found unpersuasive in this opinion. In each instance, we have found McCartney either failed to show trial counsel's performance was inadequate or that he failed to show there was a reasonable probability but for counsel's alleged deficiencies, the result of the proceeding would have been different. (*Ledesma*, *supra*, 43 Cal.3d at pp. 217-218; *Strickland*, *supra*, 466 U.S. at p. 687.)

If the record substantiated McCartney's claim that defense counsel "could not make any reasoned determination as to what strategy to pursue because he had failed to

---

[14] McCartney's complaints largely related to trial tactics and strategy and, under the circumstances of this case, do not constitute the type of "irreconcilable conflict" that indicates defense counsel's representation was inadequate. (*People v. Welch* (1999) 20 Cal.4th 701, 728-729.) The fact that defense counsel had represented San Francisco police offers in matters before the Police Commission unrelated to this case does not indicate a conflict that required defense counsel be removed as McCartney's counsel.

engage in any real investigation" it would raise serious legal questions. However, this is not how we read this record. Instead, we believe this record reflects experienced counsel making informed strategic judgments under circumstances in which the defense options were extremely limited, due to the strength of the prosecution's case. Defense counsel's informed decision to pursue and focus on other issues, rather than those suggested by McCartney at the *Marsden* hearings, hardly makes defense counsel's advocacy constitutionally ineffective. (*People v. Cole* (2004) 33 Cal.4th 1158, 1192 [defendant does not have the right to present a defense of his own choosing, but merely the right to an adequate and competent defense].)

In light of the overwhelming evidence of McCartney's guilt, we entertain no doubt that even the most experienced defense counsel with unlimited time and an infinite investigative budget would have encountered difficulty in preparing an effective defense for this trial. Included in the prosecution's arsenal was Claudia's unwavering identification of McCartney and her harrowing description of the attack, the DNA match with an infinitesimally small chance of error, testimony from another victim who had been sexually assaulted by McCartney, and similarities between the sketch of Claudia's attacker and McCartney's mug shot taken around the same time. Acknowledging the strength of this evidence, coupled with a headstrong client who repeatedly questioned counsel's competence in a series of *Marsden* motions, it would be entirely inappropriate for this court to engage in Monday morning quarterbacking of defense counsel's choice of trial strategy.[15]

Furthermore, in casting aspersions on the way counsel conducted his defense, McCartney fails to specify how the jury's verdict would have been affected by the additional information that he now claims was necessary. Even with the benefit of hindsight, appellate counsel does not allege the existence of facts, information, or specific

---

[15] McCartney has even attempted to use the fact that he physically assaulted his defense counsel in court to his tactical advantage. In a handwritten letter setting out potential issues for appeal, McCartney writes: "[A]fter assaulting my lawyer the court still forced me to keep my lawyer."

evidence possessing a reasonable possibility of having a substantial effect on the jury's verdict. Thus, there is no basis to find "a reasonable probability that . . . the result of the proceeding would have been different" if counsel had pursued and focused on the arguments advanced during his various *Marsden* motions, which are also the focus of his appeal and habeas corpus writ petition. (*Strickland*, *supra*, 466 U.S. at p. 694.)

Thus, McCartney has not made either of the requisite *Strickland* showings with respect to his trial counsel's alleged failings. Consequently, there is no showing the trial court abused its discretion in denying his motions for substitute counsel pursuant to *Marsden*. (See, e.g., *People v. Vines* (2011) 51 Cal.4th 830, 878 [denial of a *Marsden* motion is not an abuse of discretion unless the defendant shows that the trial court's failure to remove counsel and to appoint new counsel substantially impaired the defendant's right to effective assistance of counsel].)

## IV.
## DISPOSITION

The judgment is affirmed and the petition for writ of habeas corpus is denied.

_____
RUVOLO, P. J.


We concur:


_____
REARDON, J.


_____
RIVERA, J.